# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**UNITED STATES OF AMERICA,**
    **Plaintiff,**

v.                                                                                           5:21-cr-88-JA-PRL

**MICHAEL TYRONE YOUNG,**
    **Defendant.**
_____/

### REPORT AND RECOMMENDATION[1]

Defendant Michael Tyrone Young is charged by indictment with one count of being a felon in possession of a handgun in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). (Doc. 6). A jury trial is currently set for the June 2022 trial term. (Doc. 37). Young has filed a motion seeking to suppress a Taurus 9 mm handgun and associated ammunition taken from his person, and subsequent statements he made about the gun. Young argues that the evidence was obtained in violation of his Fourth Amendment right to be free from unreasonable search and seizure. (Doc. 29).

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

I.   **BACKGROUND**[2]

The underlying events occurred at Berkeley Pointe Apartments ("Berkeley Pointe"), a public housing complex in a residential area of northeast Ocala. The complex provides housing for qualified, low-income residents through the United States Department of Housing and Urban Development (HUD) using Section 8 certificates and vouchers.

Potential tenants must complete an application process and if they meet the income and other requirements to live there, they are assigned to a particular apartment and provided with a written lease and rules packet. Only persons listed on the lease are permitted to reside in the assigned apartment. Pursuant to the rules, a tenant is permitted a guest at the apartment, limited to 14 days. To stay beyond the 14-day window, the guest is required to come to the front office, meet with management and complete the background paperwork necessary to become a tenant. If approved, the guest may remain at the complex in the assigned apartment as a tenant and the guest's name would be added by management to the roll of persons residing at Berkeley Pointe. According to records from Berkeley Pointe, Young has never been a resident there.[3]

The complex has approximately 20 free-standing two-story buildings, with four units per floor. The units are separated by open-air hallways with staircases at the end of each hallway. Berkeley Pointe is surrounded by a 6-foot black metal fence with two primary points

---

[2] The Court held a hearing on Young's motion on May 12, 2022 during which Officers Joseph Tussey and Jacob Zaino of the Ocala Police Department testified. The Government submitted the body-camera video of both officers taken during the incident, which the Court reviewed. The Court also heard testimony from Jeffrey Scott Bolin, a crime analyst with the Ocala Police Department; Jasmina Terrell, the community manager at Berkeley Pointe Apartments; FBI Special Agent Brian Smith; and Young's girlfriend, Shawneeka Townsend.

[3] In addition, records from the State of Florida Department of Highway Safety and Motor Vehicles list Young's current and historical addresses, none of which are at Berkeley Pointe. (Doc. 36, Exhibit 10).

of entry on Northeast 7th Street—mechanical gates for cars and a fenced swinging door for pedestrians. (Doc. 29-1, Point A, Doc. 36, Exhibits 8A, 8B, 9). The front mechanical gates at Berkeley Pointe are unreliable and have been inoperable on and off for the past 12-18 months. When the gates are not working, they are left open, allowing access to the general public. On August 31, 2021, at least one side of the mechanical gate was not functioning.[4] Likewise, although the pedestrian gate had a security lock and required an access card, it had not been working since July 2021 and the gate could be accessed by simply pulling hard enough to open it. There is also a chain link fence on the northwest side of the property (next to a locked gate for the complex's lift station) that is damaged and regularly scaled by residents and visitors to the complex. (Docs. 29-2 at Point B36; Doc. 36, Exhibits 11A, 11B, 11C; Doc. 42, Exhibit 11D).

For years, Berkeley Point has been the scene of gang activity, violent crime, and drug offenses, including shootings within the complex and in the surrounding residential area. In 2021 alone, the Ocala Police Department ("OPD") responded to approximately 190 calls to Berkeley Pointe relating to violent/person crimes. (Doc. 36, Exhibit 14). As a result, Berkeley Pointe is almost always designated by OPD as a "focus area" for OPD's efforts to combat crime. And with the consent of Berkeley Point's management, OPD officers routinely patrol the complex on foot or in vehicles to reduce criminal activity. To that end, management has provided OPD with codes for gate entry. According to Officer Tussey, depending on call volume, he might patrol Berkeley Pointe up to ten times during a shift. On March 15, 2019,

---

[4] Ms. Terrell testified that both sides of the front mechanical gate were not functioning in August 2021. However, the defense submitted video footage showing that the ingress gate was functional on August 31, 2021. (Doc. 45, Exhibit M). Ms. Terrell explained in reviewing her records she had found a September 4, 2021 email requesting gate repair and she had assumed both sides of the gate were not functioning. She confirmed, however, that it is possible for one side of the gate to be functional while the other is not.

Berkeley Pointe's management granted OPD written authority to issue trespass warnings (on management's behalf) to individuals discovered on the property who do not reside there. (Doc. 36, Exhibit 15). Young—who has never been a registered resident of the complex—has been the subject of at least two such warnings. (Doc. 36, Exhibits 16A, 16B).

Shortly after midnight on August 31, 2021, Officers Tussey and Zaino parked their vehicle at a nearby park and jumped over the chain link fence to conduct a routine foot patrol of the property.[5] The Officers patrolled the area regularly and were aware of recent reports of gang-related criminal activity including firearm violations, and Berkeley Pointe's designation as a focus area. They wore their standard issue OPD police uniforms with agency insignia, badges, name plates, and equipment displayed.

As they walked along the perimeter of the complex, Officer Tussey heard two male voices coming from the lower level of Building #2861. From the Officers' experience, law-abiding citizens in Berkeley Pointe did not congregate in the hallways at that late hour so they went to investigate. The Officers were able to approach Building #2861 and observe the lower level without being seen. (Doc. 36, Exhibit 17).[6] Although hallways of other nearby buildings were fully illuminated, the ground floor hallway lights of Building #2861 had been mostly disabled with only one overhead light working at the far end of the hallway from the officers.

From his vantage point, Officer Tussey saw two black males at the far end of the corridor. He heard something drop to the concrete with a loud thud and saw one of the men—

---

[5] While Young's motion states that the Officers entered through "a concealed padlocked gate at the northwest corner of the fence that surrounds Berkeley Point," (Doc. 29 at 4) there was no dispute at the hearing that the Officers jumped the fence and did not enter through the gate.

[6] Officer Tussey testified that he leaned up against the corner of the building (between the corner and the electrical panel) and was able to look between the downspout and the brick of the building. (Doc. 36, Exhibit 17).

who turned out to be Young—pick it up.[7] At that point, Young started walking south through the corridor towards the staircase closest to the Officers. Because it looked like he was going to come down the stairs (a short set of approximately five steps from the open hallway to the ground), the Officers came around the corner and identified themselves. Officer Tussey stated that they were there "to combat all of the shootings." Upon seeing Officer Tussey, Young turned and started knocking on the door to Apartment D.[8] Officer Tussey testified that he immediately noticed an odor of marijuana coming from Young's hair and his clothing.[9]

A young boy opened the door of Apartment D. When Officer Tussey asked Young who lived in the apartment, he did not respond and instead began calling into the apartment, "Mom" and "Mama." Because Young seemed eager to enter the apartment, Officer Tussey said, "Why you so nervous man? You're trying to run inside." (Doc. 36, Exhibit 1 at 0:48-50). The female tenant of the apartment, E.L., soon appeared at the door. When asked, E.L. could not initially identify Young. However, a few seconds later, after Young mouthed something to her, she identified him by his first name and stated that he lived at the complex.[10]

Given his observations and E.L.'s changing answers, Officer Tussey decided to investigate further. He handcuffed Young and explained that he was being temporarily detained so that the Officers could further investigate a potential loitering and prowling

---

[7] At the hearing, Officer Zaino testified for the first time that he saw Young bend over, pick something up and put it in his waistband. On cross-examination, Officer Zaino acknowledged that he had not included this detail in any report or the arrest affidavit.

[8] Initially, while Officer Tussey spoke with Young, Officer Zaino went down the corridor and spoke with the other black male outside of Apartment B. He then joined Officer Tussey.

[9] Officer Zaino consistently reported (on video footage and at the hearing), that while he smelled marijuana, he did not know if it was coming from Young's person.

[10] Special Agent Smith testified that he interviewed E.L. in March and she confirmed that she had seen Young around the complex and had paid him to help her move furniture and bring in groceries. E.L. also told SA Smith that while she was at the door with Young (and the officers were distracted by the bystanders), he asked her to take something out of his pocket. Video footage showed Young talking to E.L. and then E.L. looking down at his pocket. (Doc. 36, Exhibit 3 at 0:45-55).

charge. At this point, another person in the hallway (referred to as Young's cousin) began arguing with and questioning the actions of the Officers. Officer Tussey repeatedly asked Young to put his back against the wall so he could talk to him. Officer Tussey explained that Young was only being detained and that "he's probably not going to go to jail, but he's in a time, in a place, in a manner not usual for law-abiding citizens, he's knocking on a stranger's door that doesn't know him." (Doc. 36, Exhibit 1 at 2:59-3:07). Because of the ongoing disturbance and Young's unwillingness to stand with his back against the wall, Officer Tussey had Young sit on the hallway stairs by Apartment D.

Officer Tussey obtained Young's name, date of birth, and social security number to run an identification check. Officer Tussey told Young that he could smell marijuana coming from Young's person and Young admitted that he had smoked some "around eight o'clock . . . sitting right here on the stairs." (Doc. 36, Exhibit 1 at 6:40-7:05). Young denied having his ID but told the Officers about his Instagram and Facebook accounts as proof of his identify. As they waited for the background check through dispatch, the Officers allowed Young to smoke one of his filtered cigarettes. Young explained that he was nervous that night because of "all the things that have been going on around here." (Doc. 36, Exhibit 1 at 9:30-38).

After onlookers in the hallway assured the Officers that Young belonged there, Officer Tussey agreed to release Young from detention and remove the handcuffs. However, he told Young, that he was going to pat him down first based on the odor of marijuana. Young insisted that he did not have any weed. At this point, less than ten minutes had passed from the officers' initial contact with Young.

The Officers repeatedly directed Young to stand up but he did not move. Young asked the Officers to help him. Officer Zaino attempted to lift Young from behind but Young made

6

no effort to stand on his own. When the Officers finally got Young to stand, a loaded Taurus firearm fell from Young's pants and dropped onto the stairs below. Officer Tussey told Young, "Thank you for not pulling that on me, man." (Doc. 36, Exhibit 1 at 10:40-45). Because of the firearm, Officer Zaino told the onlookers to return to their apartment which led to further conflict.

Officer Tussey asked Young if he had a concealed weapons permit and Young said he had it "in the house." (Doc. 36, Exhibit 1 at 11:00-15). Officer Tussey advised Young and the onlookers that "if he's got a concealed weapons permit, he's going home." (Doc. 36, Exhibit 1 at 13:10-20). Because of the disturbance in the hallway and the presence of the firearm, the officers moved Young away from Building #2861 and into the complex's lighted parking lot. As Officer Zaino walked Young across the parking lot he asked Young why he had the firearm and Young responded, "Bro, it's kids coming from other towns shooting at us!" (Doc. 36, Exhibit 3 at 12:12-12:17). Young later confirmed to Officer Zaino that the shooters he was describing were juvenile members of the "Bloods" – a gang from Deer Run, another public housing complex in Ocala.

As they waited for dispatch to check if Young had a concealed weapons permit (something he said he had), Officer Tussey asked Young, "Be honest with me – are you a convicted felon?" (Doc. 36, Exhibit 1 at 13:52-55). Young responded affirmatively and Officer Tussey thanked Young again for not pulling the firearm on the officers, saying, "That's probably why you were acting all hinked up—because you were like, 'Oh crap, I've got a gun on me.'" (Doc. 36, Exhibit 1 at 14:22-26). Young replied, "I thought you seen me pick it up— I wouldn't lie to you. . . Yes, sir – I picked it up." (Doc. 36, Exhibit 1 at 14:27-49). Young confirmed that the recovered firearm was a Taurus pistol.

The background check ultimately determined Young's status as a convicted felon and his lack of a concealed weapons permit. Accordingly, Officer Tussey placed Young under arrest. A search of Young's person revealed his wallet containing his Florida ID and a folded condom wrapper with a white powdery substance (MDMA). After waiving his constitutional rights, Young explained that he had been "looking for a certain person" when he encountered Officer Tussey. (Doc. 36, Exhibit 1 at 28:12-13). Young confirmed the object that he had dropped was the Taurus firearm, that he smoked marijuana that night, and that he did not have a medical marijuana card. The Officers also issued a trespass warning for Berkeley Pointe. (Doc. 36, Exhibit 16A).

Following Young's arrest, Officers Tussey and Zaino decided that the incident would be credited to Officer Zaino, who had less experience. With his body camera still running, and to assist Officer Zaino in accurately recording the events in the police report, Officer Tussey "transferred his [probable cause]" to Officer Zaino by recalling everything he observed that night. (Doc. 36, Exhibit 1 at 36:20-42:37). The Officers discussed testing procedures for the recovered drugs, the names of witnesses and the applicable criminal charges.

Officer Zaino then transported Young to the Marion County Jail. During the transport, Young was moving around a lot in the back seat, causing Officer Zaino to verbally check on him several times. The interior camera in the patrol car captured Young's efforts to dislodge a hand-rolled, unfiltered cigarette that was concealed by his hair above his right ear. (Doc. 36, Exhibits 5, 6A-E). Based on the Officer Zaino's experience, and after reviewing the video from the transport, he testified that it resembled the type of cigarette often used to smoke a controlled substance, such as marijuana. Over the next several minutes, Young repeatedly

8

twisted and contorted his handcuffed body to retrieve the cigarette. The cigarette was never found by law enforcement so the Government speculates that Young swallowed it.

Almost four months later, at approximately 3:00 a.m. on December 27, 2021, Officer Zaino encountered Young again at Berkeley Pointe. (Doc. 36, Exhibit 7). This time, Young was sitting outside on the second level stairs of a different building (#2869). After Officer Zaino approached him, Young climbed the stairs and walked down the hallway to Apartment H—a unit leased to his girlfriend. He repeatedly knocked on the door of Apartment H and said that he was staying there. After several minutes, no one answered and Young could not otherwise verify that he was staying there. Given his prior encounter with Young, Officer Zaino detained Young to determine whether Young was in fact staying at that apartment. In his supplemental report, Officer Zaino wrote that in his "last encounter with Young while attempting to verify his address, he knocked on a resident's door stating he stayed with that person. When the resident answered the door, the resident stated Young did not belong there nor ever stayed in that apartment." (Doc. 29, Exhibit L). Young was ultimately searched and arrested on drug charges. He was also issued a second trespass notice for the entire complex. (Doc. 36, Exhibit 16B).[11]

## II. DISCUSSION

Young argues that (1) he "had a reasonable expectation of privacy in the common areas of Berkeley Pointe and the police violated the Fourth Amendment by surreptitiously

---

[11] Young does not seek to suppress evidence related to his arrest on December 27, 2021. Rather, he argues that within months the Officers "perpetuated a false narrative to illegally detain Mr. Young on two occasions." While Officer Zaino did not recite correctly what E.L. said on August 31, 2021, there is no dispute that Young did not stay at Apartment D and there is no suggestion that he had knocked on the door of that apartment for any reason other than to get away from the Officers. The Court is unpersuaded that Officer Zaino's imprecise words evidence a "false narrative" or otherwise undercut the Officers' reasonable suspicion to detain Young on August 31, 2021.

entering the complex to search people for guns and drugs without a warrant"; and (2) the Officers lacked reasonable suspicion to detain him and place him in handcuffs. Both arguments are unavailing.

### A. No reasonable expectation of privacy

The Fourth Amendment protects only those places in which an individual can establish that he had a reasonable expectation of privacy against government intrusion. *United States v. Cooper,* 203 F.3d 1279 (11th Cir. 2000). A defendant's legitimate expectation of privacy exists when he can show a subjective expectation of privacy that society is prepared to recognize as being reasonable. *U.S. v. Ford*, 34 F.3d 992, 995 (11th Cir. 1994). This is a fact-specific inquiry and "the defendant bears the burden of proving facts that demonstrate the reasonableness of his expectation of privacy in the searched area." *U.S. v. Miravalles*, 280 F.3d 1328, 1332 (11th Cir. 2002).

Even assuming that Young is a resident of Berkeley Pointe (or a guest legally staying there), he did not have a reasonable expectation of privacy in the common areas of Building #2861. Contrary to Young's assertion, Berkeley Pointe is not fully enclosed and secured from the public. The front mechanical gates for vehicle traffic are unreliable and have been inoperable on and off for the past 12-18 months. When one or both sides of the gate are not working, they are left open, allowing access to anyone who wants to enter. Similarly, despite security features, the pedestrian gate can be accessed by simply pulling hard enough to open it. In addition, residents and guests routinely enter and exit the complex by scaling the damaged chain link fence on the northwest side of the property. As for the buildings, the hallways—like the one where Young was first seen by the police and then where he was encountered—are not enclosed and can be freely accessed by short open staircases on each

end of the hallway. Accordingly, on the day of the search, the entire apartment complex, including the hallways and other common areas were open and accessible to tenants, their guests, management, workers, delivery drivers, and the public at large. Moreover, with the consent of management, OPD officers routinely patrol (and have been patrolling for years) Berkeley Pointe by foot and by car. Under these circumstances, any expectation of privacy in the common areas of Building #2861 was "not only unreasonable, but foolhardy." *Miravalles*, 280 F.3d at 1333 (no expectation of privacy exists in common areas of "large, high-rise apartment building, the front door of which has an undependable lock that was inoperable on the day in question").

Accordingly, Young has failed to show a Fourth Amendment violation based on the Officers' warrantless presence at Berkeley Pointe.

### B. Officers had reasonable suspicion

The Officers' initial encounter with Young in the common area of the apartment complex does not "implicate the Fourth Amendment at all." *U.S. v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Id.* (quoting *U.S. v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)). Indeed, even if law enforcement has no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search, so long as they "do not induce cooperation by coercive means." *U.S. v. Drayton*, 536 U.S. 194, 202 (2002). Here, after seeing two men in the darkened, open-air hallway of the complex, the Officers were free to approach and ask questions. And the Officers' immediate observations—i.e., the odor of marijuana and Young's attempts to get access to an apartment where he did

11

not live and where the tenant did not immediately recognize him—are not subject to suppression.

The Fourth Amendment was implicated only when the Officers detained Young to conduct a further investigation—that is, when a reasonable person would no longer feel free to decline the officers' requests or otherwise terminate the encounter. *Id. at* 201. An officer may, consistent with the Fourth Amendment, "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Although the "reasonable suspicion" standard is less demanding than the "probable cause" standard, it still requires the officer to articulate "a minimal level of objective justification for making the stop" more than "an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id.* at 124 (quoting *Terry*, 392 U.S. at 27).

The standard is an objective one, based on the totality of the circumstances. *U.S. v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). The court views the circumstances in light of the officer's special training and experience. *U.S. v. Smith*, 201 F. 3d 1317, 1323 (11th Cir. 2000) (stating "behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with the practices of narcotics couriers" (quotation omitted)). "The reputation of an area for criminal activity may be considered when determining whether circumstances are sufficiently suspicious to warrant further investigation." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (punctuation omitted). And, the odor of marijuana alone may provide a reasonable suspicion for further investigation of possible criminal conduct. *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010); *see also, United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (*en banc*) (holding that the "agent's suspicions rose to level of probable cause

when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.")

Here, leading up to the decision to detain Young, the Officers were aware that Berkeley Point was a high-crime area, with recent gang-related shootings. The Officers first observed Young in a darkened hallway after midnight. Based on their frequent patrols of the complex, the Officers knew that the complex's residents did not typically congregate in the open-air hallways at that time of night, and, unlike the other buildings, the hallway lights in Building #2861 had been largely disabled. As the Officers watched, Young dropped and retrieved a heavy object that could have been a weapon. When the Officers approached and explained that they were there because of the recent shootings, Young appeared nervous and immediately knocked on the closest door, which was Apartment D. Young ignored Officer Tussey's questions about who lived in the apartment, and instead called into the apartment, "Mom" and "Mama." The female tenant of the apartment, E.L., initially did not know his name but changed her answer seconds later after Young mouthed something to her. As they stood next to Young, both officers smelled the odor of marijuana and Officer Tussey could tell that the smell was coming from Young's person.

The totality of these circumstances clearly establish that these officers had a reasonable suspicion of criminal activity, allowing them to detain Young. Under Florida law, the elements of the offense of loitering and prowling were easily met: (1) the defendant loitered or prowled in a place, at a time, or in a manner not usual for law-abiding individuals; and (2) such loitering or prowling were under circumstances that warranted a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.

Fla. Stat. § 856.021. Likewise, the odor of marijuana alone justified Young's detention. *White,* 593 F.3d at 1203.

Young argues that Officer Tussey is not credible given a prior disciplinary action. (*See* Doc. 29, Exhibits F-K). However, Officer Tussey's version of the events at issue is corroborated by the video footage, as well as Officer Zaino's testimony. And Officer Tussey's statement that he could smell the odor of marijuana coming from Young's hair and clothing—while not corroborated by Officer Zaino—is corroborated by Young's own admissions that he had smoked marijuana earlier that same evening and that the odor was on his person. (Doc. 36, Exhibit 1 at 28:58-29:08).

### III. RECOMMENDATION

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress (Doc. 29) be **denied.**

DONE and ENTERED in Ocala, Florida on May 18, 2022.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record